### MAGONE, Collector, v. VOM CLEFF et al.

(Circuit Court of Appeals, Second Circuit. December 2, 1895.)

1. CUSTOMS DUTIES—CLASSIFICATION—"STEEL STRIPS."

Strips of steel, from 6 to 12 millimeters wide, $12/100$ to $20/100$ of a millimeter long, cold rolled, tempered, polished, with edges slightly rounded, which are used for the manufacture of steel tape measures, are comprehended in the ordinary meaning of "steel strips" or "strip steel"; and a jury having found, on conflicting evidence, that those terms have no commercial meaning different from the ordinary meaning, *held*, that such steel was dutiable by that designation, under paragraph 177 of the act of March 3, 1883, and not as "flat steel, No. 39," at 45 per cent. ad valorem, under paragraph 183.

2. SAME—INSTRUCTIONS—COMMERCIAL MEANING.

It was proper to refuse an instruction to find for defendant if the merchandise in question was commercially known as "wire" or "steel wire," where there was no evidence that these terms had any special or restricted trade meaning.

In Error to the Circuit Court of the United States for the Southern District of New York.

This was an action at law by Robert Vom Cleff and another against Daniel Magone, late collector of the port of New York, to recover duties paid under protest. In the circuit court upon the first trial there was a verdict for defendant, but the same was set aside and a new trial granted because of error in the charge. 57 Fed. 198. Upon the second trial there was a verdict for plaintiffs, and judgment accordingly, from which the collector has appealed.

James T. Van Renselaer, Asst. U. S. Atty., for plaintiff in error.

Everit Brown, for defendants in error.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The plaintiffs below were importers, and their action was brought to recover for excess of duties exacted by the defendant as collector on merchandise imported by them into the port of New York. The merchandise, which is described in the invoices as "polished tempered steel, edges rounded," was imported about May 1, 1889, while the tariff act of March 3, 1883, was in force. The collector classified it as "flat steel, No. 39," and assessed it for duty under paragraph 183, which exacts a duty of 45 per cent. ad valorem on "steel, not especially enumerated or provided for in this act." The importers insisted that their mer-

chandise was within the enumeration of paragraph 177, which reads as follows:

"177. Steel ingots, cogged ingots, blooms and slabs, by whatever process made; die blocks or blanks; billets and bars and tapered or bevelled bars; bands, hoops, strips, and sheets of all gauges and widths; plates of all thicknesses and widths; steamer, crank and other shafts; wrist or crank pins; connecting rods and piston rods; pressed, sheared or stamped shapes, or blanks of sheet or plate steel, or combination of steel and iron, punched or not punched; hammer-moulds or swaged steel; gun moulds not in bars; alloys used as substitutes for steel tools; all descriptions and shapes of dry sand, loam, or iron-moulded steel castings, all of the above classes of steel not otherwise specially provided for in this act, valued at four cents a pound or less 45% ad valorem; above four cents a pound and not above seven cents a pound, two cents per pound," etc. "Provided, that on all iron or steel bars, rods, strips or steel sheets, of whatever shape, and on all iron or steel bars of irregular shape or section, cold-rolled, cold-hammered, or polished in any way in addition to the ordinary process of hot-rolling or hammering, there shall be paid one-fourth cent per pound, in addition to the rates provided in this act; and on steel circular saw plates there shall be paid one cent per pound, in addition to the rate provided in this act."

The evidence showed that the merchandise was steel varying from 6 to 12 millimeters in width, from $^{12}/_{100}$ to $^{20}/_{100}$ of a millimeter in thickness, and from 200 to 500 feet in length. It is imported in coils, and used for the manufacture of steel tape measures. Manifestly, each of these long, narrow coils is fairly within the ordinary meaning of the words "steel strip," since it is steel, and is "a narrow piece, comparatively long," which is the definition of strip given by Webster's Unabridged and by the Century Dictionary. Testimony was introduced as to the trade nomenclature of the merchandise in question, and as to the trade meaning of "steel strips" and "strip steel." The court left it to the jury to say whether the words "steel strips" had "acquired a definite and well-known meaning, different from their ordinary meaning, * * * so that, when spoken among persons engaged in trade and commerce, it would mean something else, and not the [merchandise in question]." There was a conflict of evidence on that point, no error in the judge's charge is shown, and the verdict of the jury is therefore conclusive that the words have in trade and commerce the same meaning which they have in common speech.

The evidence showed that the merchandise was made from a steel bloom or bar or billet, heated thoroughly, passed through rollers until it was reduced to what is called a "steel band." After that it was passed through cold rollers until it became as thin as desired. Then it went through the tempering process, was polished, cut into strips of the desired width, and the edges ground smooth and slightly rounded, so as to be entirely comfortable to the touch. Having been cold rolled and polished, the strips were clearly within the proviso of paragraph 177, and paid duty accordingly. It is true that the strips are also tempered, and have smooth, rounded edges; but that circumstance is not sufficient to take them out of the class of steel strips, unless these additional processes have advanced them into some other class of articles, commercially recognized as different from steel strips. The verdict of the jury, however, is conclu-

sive on that point. When they found that the phrase "steel strips," as used in trade, included these articles, they necessarily found that the tempering and edge rounding had not advanced them into something commercially different from "steel strips."

The plaintiff in error contends that congress has particularly defined the "steel strips" which alone are dutiable under paragraph 177, and that all strips to which a further process of manufacture than such as is enumerated in the paragraph has been applied are not within the terms of the paragraph. We fail to find any such definition in the paragraph referred to. In the body of such paragraph a certain rate of duty is laid upon steel bands, hoops, strips, and sheets, of all gauges and widths. It contains no restriction as to process or extent of manufacture. If an article is a steel band or hoop or strip or sheet, alike in common speech and commercial designation, it falls within this enumeration, no matter what has been done to it, unless what has been done to it has advanced it into some other commercially recognized class of articles. Standing alone, the body of the paragraph covers bands, hoops, strips, and sheets, hot rolled or cold rolled, hot hammered or cold hammered, tempered or untempered, annealed or unannealed, polished or unpolished on face or edge, or both. Congress by the proviso takes out of this general class a subclass, which comprises steel strips or steel sheets which have been cold rolled, cold hammered, or polished in any way in addition to the ordinary process of hot rolling or hammering, and upon the subclass lays an additional duty. Nothing in the paragraph, either in the body or the proviso, either expressly or by implication, excludes from the class or the subclass steel strips which have been tempered, or which have had their edges rounded. To hold that such additional processes, although they do not advance the steel strips into some other recognized class of merchandise, nevertheless exclude them from the class in which the language of the paragraph plainly includes them, would be legislation, not construction.

It is further assigned as error that the circuit court declined to charge, as requested, that:

"If the jury find this merchandise to have been in fact, or to have been known commercially on March 3, 1883, as wire of any kind, or as anything else than 'steel strips,' the defendant is entitled to a verdict."

There is no proof in the case that the term "wire" or "steel wire" had any special or restricted trade meaning. It would have been error, therefore, to submit the question as to the trade meaning of those terms to the jury. The judgment of the circuit court is affirmed.